A. U. MORSE & Co.
HOYT, SHEPSTON & SCIARONI } *v.* UNITED STATES

No. 8131.—
Entry No. 193.

(Decided June 17, 1952)

*Lawrence, Tuttle & Harper (George R. Tuttle* of counsel) for the plaintiffs.
*Charles J. Wagner*, Acting Assistant Attorney General (*Joseph E. Weil, John J. Antus*, and *Dorothy C. Bennett*, special attorneys), for the defendant.

EKWALL, Judge: This appeal for reappraisement involves the value of certain black sheathing felt imported from Belfast, Ireland, in June 1945. The merchandise was imported packed in crates containing 10 rolls of sheathing felt 25 yards long by 32 inches wide. The merchandise was invoiced at £6/10/6 per crate, f. o. b. port of shipment. On entry, the nondutiable charges of dues in Liverpool, inland freight to Liverpool, cartage in Belfast and Liverpool, and consul fees were deducted, but an amount was added by the importer because of advances by the appraiser in a pending case to equal 4½ pence per linear yard, plus 50 per centum, less 2½ per centum, plus 9 shillings per crate for packing. The value at which the sheathing felt was entered represented the foreign value of the merchandise.

The plaintiffs contend that the invoice value, less the nondutiable charges, which represents the export value, is the value that should be adopted for the reason that the foreign market is controlled and the merchandise is not freely offered for sale to all purchasers.

At the trial an affidavit signed by Robert Martin was admitted in evidence on behalf of the plaintiffs. The affiant stated that he was in complete charge of all sales of sheathing felt for Robert McCalmont & Sons, Ltd., of Belfast, Ireland, the shipper of the merchandise herein, and was familiar with the price at which the black sheathing felt in question was sold. The affiant stated that the freely offered price for export to the United States, packed, ready for shipment at the port of shipment was £6/10/6 per crate. The affiant also stated that all felt manufacturers since the year 1937 have made their sales on the basis of agreed-upon prices when selling felt for home consumption. The affiant stated that in selling in the home market, the manufacturers did not freely offer the merchandise to all purchasers at a single price but said prices varied according to the business category in which the purchaser was engaged, and that these purchasers, when reselling, were required to agree to resell only to specified trade groups and at certain prices fixed by the manufacturer. Each class of purchaser paid the list price, but with various discounts and plussages when purchasing the merchandise from the manufacturers. In respect to the restrictions imposed on resales, the affiant stated:

In making such sales, the manufacturers required that Listed Factors could sell only to ironmongers, builders and users, and only at the above listed price applicable to such trade, that Asphalt Factors could sell only to asphalters and only at the asphalters' listed price, and that galvanizers factors could likewise sell only to galvanizers direct and at the price listed above for such buyers. Also, these factors were required to furnish the manufacturers with the names of their buyers so that performance of their agreement could be observed. Furthermore, the manufacturers then refrain from offering this merchandise to the factors' purchasers and also agree to refer to the factors any enquiries they may receive from these clients and from other people that are likely to be buyers from them.

Evidence was also produced on behalf of the plaintiffs to establish that there had been a typographical error in the foregoing affidavit

relative to the consular invoice number covering the merchandise in question.

The examiner of merchandise at the port of San Francisco testified on behalf of the Government that he had examined importations of sheathing felt from England and Ireland, including the imported merchandise. From his examination of black sheathing felt, he found it impossible to find any difference in the merchandise from the various factories. In his opinion, sheathing felts were similar in all material respects insofar as his inquiries could determine. The importations all weighed the same. They were imported at the same prices, or approximately the same prices, for the same period. He testified that he made his appraisements upon the basis of the reports of a Treasury representative in the foreign field. These reports were all admitted in evidence on behalf of the Government.

The reports of the Treasury representative, admitted in evidence on behalf of the Government, all state that the plussages on the basic price per yard, and the discount on the basic price, were determined solely by the status of the purchaser, regardless of the quantity purchased. That is to say, the price is varied according to the sort of business in which the purchaser engages and that these purchasers were expected to resell only at the prices the second purchaser would have been able to buy from the manufacturer, and it was pointed out that builders and ironmongers rarely purchased direct from the manufacturer, although such manufacturer would not refrain from so selling. The Treasury representative in each of the reports stated that it is understood that the galvanizer factor was to resell to the galvanizer at the same price that the factor pays the manufacturer except that he retains the 3¾ per centum discount as his profit. He also advanced the opinion that "the galvanizer has always the privilege or option of purchasing direct from the manufacturer instead of passing thru the intermediary of a factor."

It is particularly noted in these reports that the Treasury representative entirely neglects to state what would happen if the asphalt factors sold to the ironmongers or to the galvanizers who were users of the felt in question. It is stated in the affidavit of the seller that the listed factors sell only to builders and users and ironmongers at the prices listed as applicable to such trades; asphalt factors sell only to asphalters; and the galvanizers' factors sell only to galvanizers. Even if the manufacturers sold to the retail users, and the Treasury representative admits that such sales are rare, the prices would still be governed according to the class of purchaser.

There seems to have been some discrepancy in the affidavit of the seller relative to the plussages. A letter from the Treasury representative was written to the exporter of the merchandise, noting that

the plussage to builders and other users was noted at 55 per centum whereas his information was that such plussage should be 60 per centum. In reply, the manufacturer's office stated that obviously an error had been made by the typist and that the plussages given for the builders and users and those given the ironmongers and merchants were transposed.

From a careful consideration of the evidence before me, I am of the opinion that the foreign market for the sheathing felt in question was a controlled market but that the merchandise was freely offered for sale in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States.

I therefore find the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, to be the proper basis for the determination of the value of the sheathing felt in question, and that such value was £6/10/6 per crate, less nondutiable charges, as invoiced.

Judgment will therefore be entered accordingly.